UNITED STATES of America,
Plaintiff–Appellee,

v.

Phillip MARSH, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Marlene MARSH, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Douglas CARPA, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jill SPENCER, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Darrell SPENCER, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

John CAMPION, a/k/a Joseph Coltrane,
Defendant–Appellant.

Nos. 96–10287, 96–10288, 96–10289,
96–10291, 96–10292, 96–10293.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1998.

Decided May 27, 1998.

William A. Cohan, La Jolla, CA, for defendant-appellant Phillip Marsh.

Shari L. Greenburger, Serra, Perelson Law Firm, San Francisco, CA, for defendant-appellant Marlene Marsh.

Henry G. Wykowski, Henry G. Wykowski & Associates, San Francisco, CA, for defendant-appellant Jill Spencer.

Michael Stepanian, Jai M. Gohel, San Francisco, CA, for defendant-appellant Darrell Spencer.

Arthur Pirelli, San Francisco, CA, for defendant-appellant Douglas Carpa.

George C. Boisseau, Santa Rosa, CA, for defendant-appellant Joseph Coltrane.

Albert S. Glenn, Asst. U.S. Atty, Chief, Appellate Section, Sandra Teters, Thomas Carlucci, Assit. U.S. Atty, San Francisco, CA; Frank P. Cihlar, Atty, Tax Division, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before: NOONAN and THOMAS, Circuit Judges, and PREGERSON *, District Judge.

NOONAN, Circuit Judge:

Phillip Marsh and his five co-defendants appeal their convictions of conspiring to defraud the United States by impeding the collection of federal income taxes and their convictions of related crimes. They also appeal their sentences, which, as to Phillip Marsh total a term of imprisonment of 17 1/2 years, as to his wife Marlene a term of 14 years, and as to the other defendants lesser but still substantial periods of prison.

## FACTS AND PROCEEDINGS

Phillip Marsh was the founder in 1990 of The Pilot Connection Society, often self-identified by its acronym TPCS. Marsh's enterprise offered its customers the elusive and enchanting prospect of untaxing themselves. The verb "untax" entered the language in political conflict in England over a formidable tariff on foreign grain and denoted political action by the government ("Who will untax our bread?" E. Elliott, *Corn–Law Rhymes*, 1833). "Untax," as used in the present context, means freeing oneself from any legal obligation to pay any income tax, federal or state.

To achieve this exceptional state, TPCS offered an "Untax Package." The package included Phillip Marsh's *The Compleat Patriot*, the Constitution of the United States, Psalm 91, and a photograph of Phillip and his wife suitable for framing. It also included "Very basic untax documents and their instructions." Among them were a form letter to be sent to the District Director of the Internal Revenue Service stating that the quondam taxpayer had recently found out that the director had been "attempting to extort money" from him and demanding that he justify his jurisdiction by a certified copy of the director's designation of authority from the Secretary of the Treasury. The letter was not to be xeroxed and was to be handwritten because "[i]t takes 3 to 5 times as long to read hand written material as it does to read typed material—anything to slow the IRS down!" Another form letter, to be similarly copied by hand, informed the district director that the taxpayer was not a person under the director's jurisdiction.

The Untax Package included another form by which the taxpayer revoked income tax returns previously signed by him and "cancelled" his signature on such returns. This form was to be retyped by the taxpayer, eliminating the Pilot Connection letterhead, and to be notarized. The theory of the revocation and cancellation, as explained in the Untax Package, was that the IRS would use earlier returns to prove that the taxpayer was aware of his obligation to file and pay. The revocation and cancellation would, so the Untax Package suggested, eliminate this easy evidence of the taxpayer's wilfulness in now refusing to file and pay. The reason that the taxpayer could so readily remove himself from the taxpaying rolls was, according to TPCS, that "income tax is voluntary." (SER 32.) If you didn't want to pay it, you didn't have to.

TPCS also advised its members to resort to "alternative banking," that is, to pay everything by cash or postal money order, or to join something called the National Commodity and Barter Association and use "warehouse banking," or to have some trusted associate open an account for one in the

---

* Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

associate's name, or to establish, with TPCS's help, an "offshore trust." The reason for adopting one of these alternative styles of money management was that if you opened a checking or savings account you agreed "that the money belongs to the bank from that moment on," with the implication that the bank would surrender the money on levy by the IRS. (SER 36.) Members were provided with forms, to be recopied and notarized, of revocation of bank signature cards. (SER 35.)

Another practical precaution the TPCS member was advised to take, in order to assure that his emancipation from taxation was effective, was to file W–4s with his employers claiming as many exemptions as he had thousands of dollars of income. For example, if he earned $30,000, he was to file a W–4 claiming 30 exemptions. The member was assured by TPCS that there was no limit to the number of exemptions he could lawfully claim. (SER 342.) No mention was made of any duty to have a reason for claiming an exemption.

Untax Packages, the contents sometimes different in unessential detail, were sold by TPCS for a price that varied for the occasion. At the start the price was over $6,000. (SER 8.) The price announced in January 1993 was "$2,100 *or* 10% of your existing tax problem (if any), whichever is higher." (SER 380.) As of January 31, 1990, TPCS had only three purchasers of the Untax Package. By December 31, 1993, TPCS recorded 3,848 purchasers and income from them of $7,638,625. (SER 19.)

TPCS had ordinary members who did not purchase the Untax Package but who did pay $45 for membership. By the end of 1993 there were 12,617 in this category. (SER 19.) They received TPCS's magazine, *The Connector*. The magazine carried the subtitle "The Voice of Freedom" and ran a facsimile of an American flag as its logo. Its pages repeated at their foot the mantra of the Society, "Income Tax Is Voluntary!" *The Connector* informed its readers that there was no law making anyone liable for income tax.

TPCS had a cadre superior to that of mere members, constituted by those admitted to the status of Associate Member. An Associate Member had the right to sell the publications of TPCS. He paid $10,000 to acquire the franchise and the confidential instructions on marketing that accompanied the franchise. By December 31, 1993, there were 730 persons who had been admitted to this advanced status. Apparently some associates got a discount, for the total paid by them recorded in the Society's books was $5,281,010. (SER 19.)

Phillip Marsh conceived the idea of TPCS. His wife Marlene joined him in marketing it. Together they traveled the United States soliciting the purchase of memberships and Untax Packages and speaking at seminars and conferences intended to promote TPCS. Marlene's daughter, Jill Spencer, was an Associate Member and the office manager, in the latter capacity opening and distributing mail sent to TPCS, logging cash received and responding to some customer complaints. Her husband Darrell was also an Associate Member. He became TPCS's General Manager, overseeing staff and publications, revising the Untax Package, and writing in his own name in *The Connector*, to explain why paying income tax was optional.

A family operation, TPCS was aided by Joseph Coltrane, alias John Campion, and by Douglas Carpa. Coltrane was the National Coordinator of the TPCS sales force. Carpa was not a TPCS member but from approximately May 1991 to June 1992 assisted the marketing of memberships in TPCS by putting together trusts in which TPCS members might hope to hide their assets from the IRS. He offered his drafts of trust instruments only to those who purchased the Untax Package. He assured members that his trusts were "old and cold" and would work to cure even preexisting problems with the IRS because the trusts would be predated to a time before an IRS lien.

In its publications TPCS asserted that it was not a tax protester movement, that it did not deny the constitutionality of the Internal Revenue Code, and that it did not maintain that Congress lacked the power to tax income. TPCS simply taught that Congress had not exerted that power and that the IRS was "a private corporation" engaged in lawless efforts to extract money from Americans

not obliged to pay. TPCS characterized its own teachings as educational and added that they were the exercise of free speech, protected by the First Amendment from prosecution.

TPCS was aware that the IRS challenged its view of the law, an awareness reinforced by the rejection that TPCS's Untax Package received when put into practice by members. The IRS by 1991 was aware of TPCS and alert to its raison d'etre. In February 1992 an affidavit filed by IRS Special Agent Diane Messer characterized TPCS as an "illegal tax protester organization" and sought a search warrant authorizing the seizure of documents pertaining to TPCS and to Phillip and Marlene Marsh. The search was to be carried out at the Marshes' home, which they used as the Society's headquarters. Pursuant to the warrant, a comprehensive seizure was made of the correspondence, computers, and file cabinets of the Society.

Apparently as a response to the search, on August 12, 1992, in Stockton, California, Phillip and Marlene Marsh and Jill Spencer signed two papers alleging that certain persons were indebted to them in the amount of $350,000 each and seeking to place a commercial lien on the property of the debtors. These persons were Agent Messer and three other IRS agents involved in the search; the United States Magistrates who had authorized the search; three United States attorneys in the Eastern District of California and one United States attorney in the Northern District; Lawrence Karlton, Senior District Judge of the Eastern District; and California Superior Court Judge Jeremy Fogel. The liens were filed in Nevada and Washington.

A year later, in February 1993, a second affidavit executed by Agent Messer asserted that TPCS was "so permeated with involvement with illegal activities" that a comprehensive search could not separate the few innocent items "from the vast amount of material which will be relevant evidence of the criminal violations." The Marshes then moved from California to Colorado and from their home there continued their enterprise under the name the Liberty Foundation. A third affidavit executed by Messer led to the comprehensive search of the Colorado office in December 1993.

A grand jury had already, on November 29, 1993, indicted the defendants for conspiracy to defraud the United States. The defendants moved unsuccessfully to suppress the material seized by the government from their files. Phillip Marsh sought with equal unsuccess to introduce a report by a psychiatrist who evaluated him and found him to suffer from delusions; the psychiatrist's proffered testimony was excluded in limine on the government's motion. Trial followed in the district court for Northern California running slightly over three months, from August 29, 1994 to November 30, 1994. The jury was unable to agree on the principal counts.

The United States obtained a superseding indictment charging all six defendants with conspiracy to defraud the United States by obstructing the lawful functions of the IRS, in particular by their operation and promotion of TPCS and the Untax Package. The two Marshes and the two Spencers were personally charged with tax evasion and failure to file a return. The indictment also charged all defendants except Carpa with numerous counts of mail fraud in the sale of the Untax Package to over 3,000 persons. The two Marshes and Jill Spencer were charged with endeavoring to impede the administration of the tax laws by filing the commercial liens in Nevada and Washington against the government officials named in them.

The government announced in its Status Conference Statement that it intended to introduce "as much of its evidence as possible through 'summary witnesses.'" The defendants filed a joint motion in limine opposing this procedure: "it appears that the government intends to avoid cross-examination of the alleged mail fraud victims by hearsay summaries." The government had proposed that IRS agents read excerpts from the TPCS files. The defendants objected that the material from TPCS files—complaint letters from persons saying that they had been deceived by TPCS—fell within no exception to the hearsay rule. The defendants asserted that the procedure would violate their Sixth Amendment right to confront their accusers. Citing *Coy v. Iowa*, 487 U.S. 1012,

108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), where the Supreme Court held it unconstitutional to place a screen shielding the accusers from the defendant, the defendants here said: "Agent Durrette would be the screen between the defendants and their alleged victims."

A hearing was held the following week before the judge who had presided at the first trial in order to schedule the time allowed for trial. The court expressed dissatisfaction with the amount of time "wasted" by both sides in the first trial. The court stated that the jury had heard the details of the untaxing scheme "ad nauseam." The government argued that the first jury had been "affected by the government's inability to present the case in a way that educated them as to what our theory of the case was, what our evidence meant, during the presentation of the evidence." The court asked, "What stopped you?" The government replied that the court had stopped it from having a witness read from the material seized in the searches. The government went on to say that it had to prove the defendants' state of mind as to both the mail fraud counts and the tax evasion counts. The court: "It seems to me that is proved by the quality of the evidence as opposed to the quantity of the evidence." The court went on to say: "I thought the victims were a disaster for the government .... [T]he victims were particularly unsympathetic. They were people who were already in serious trouble with the Internal Revenue Service, were essentially tax cheats themselves; and were put on the witness stand with the representation that they were somehow victimized by the defendants .... And I'm convinced that your case ran aground with that first group of witnesses." The district court never formally ruled on the defendants' in limine motion to exclude the complaint letters; the government concluded that it had a green light.

On November 9, the government offered Agent Durrette to summarize material taken from the files of TPCS. The defendants stipulated that the material came from the files—the government would not have to prove where each piece of correspondence came from. The court described the stipulation. It was "that these TPCS client file documents would simply be stipulated as to their admission into evidence without the necessity of putting a witness on the stand to lay any foundation as to these documents. And the stipulation would be that these documents were found in one or the other of the facilities associated with the Pilot Connection Society." The government answered, "Yes." Agreeing, the defendants again vigorously objected to the government's presentation of the files through testimony about their contents by Durrette. The government replied that proof of the defendants' state of mind was "the heart and soul" of its case.

Durrette took the stand. The government had prepared an extensive file of material taken from TPCS with duplicates of a number of letters to be given as handouts to the jury. The material consisted substantially in statements of government officials as to what the income tax law was, statements of other persons including officers of the Church of Jesus Christ of Latter Day Saints on the obligation to pay income taxes, and letters from purchasers of the Untax Package complaining that the Package did not work or, worse, that they had been fraudulently induced to buy it.

The defendants objected repeatedly to the procedure—to Durrette's reading of views on the law as argument by the government, to Durrette's reading of selected passages from the correspondence as not summarizing but highlighting, and to the reading of the complaints as violative of the Confrontation Clause. Every objection was overruled by the trial court.

The second trial was two months shorter than the first. On December 13, 1995 the jury found all six defendants guilty of violating 18 U.S.C. § 371 by conspiring to defraud the United States in the collection of income taxes. Phillip and Marlene Marsh and Jill Spencer were convicted of two counts of violation of 26 U.S.C. § 7212(a) by corruptly endeavoring to obstruct the administration of the income tax laws by filing the liens. Both the Marshes and both the Spencers were convicted of violating 26 U.S.C. § 7201 by tax evasion and violating 26 U.S.C. § 7203 by failing to file tax returns. Both Marshes were acquitted of ten counts of mail fraud

and convicted of ten counts of mail fraud in violation of 18 U.S.C. § 1341. Both Spencers were similarly acquitted, Darrell of five, Jill of nine counts, and similarly convicted of nine mail fraud counts; and Coltrane was convicted of six mail fraud counts. The court denied Rule 29 motions, including motions by the Marshes and Jill Spencer to dismiss the obstruction charges on the ground of lack of venue.

On June 26, 1996 the court pronounced sentence. Phillip Marsh was sentenced to 5 years imprisonment for conspiracy to defraud the United States; 5 years imprisonment for each of his ten mail fraud convictions; 5 years imprisonment on each of two convictions of tax evasion; 3 years imprisonment for each his two endeavors to impede the administration of the tax laws; and 1 year imprisonment for each conviction of willful failure to file tax returns. The sentences for conspiracy, tax evasion and 9 of the 10 mail fraud counts were to be served concurrently with each other. The 3 year sentences for the endeavor to impede were to be served consecutively to the other counts and to each other. The 1 year sentences for the two failure to file counts were to be served consecutively to each other and the other counts. The sentence on the two tax evasion counts and two failure to file counts totals 7 years. The 5 year sentence for the tenth mail fraud charge was to be served consecutively to the extent necessary to produce a total sentence of 17 1/2 years.

Marlene Marsh was sentenced to 5 years imprisonment for conspiracy to defraud the United States, 5 years each for the 10 mail fraud counts, 5 years each for the two tax evasion counts, 3 years on each of the 2 counts of endeavor to impede, 1 year on each of the 2 convictions of willful failure to file. The 3 year sentences for endeavor to impede were to be served concurrently with each other and consecutively to the other sentences, the 1 year sentences for failure to file were to be served consecutively to each other and to the other sentences, and the 5 years for the two tax evasion counts and 10 mail counts were to be served concurrently to each other and consecutively to the other sentences to the extent necessary to produce a total sentence of 14 years. The sentence on the two tax evasion counts and two failure to file counts totals 7 years.

Darrell Spencer was sentenced to 5 years imprisonment for conspiracy to defraud the United States, 5 years on each of 9 mail fraud convictions, 5 years on each of 2 tax evasion convictions, and 1 year on each of 2 failure to file convictions. The sentence for conspiracy, the 2 tax evasion sentences, and 8 of the 9 mail fraud sentences were to be served concurrently, as were the sentences for failure to file. The sentence on the two tax evasion counts and two failure to file counts totals 5 years. The ninth mail fraud sentence was to be served consecutively to the other sentences to the extent necessary to produce a total of 7 1/4 years.

Jill Spencer was sentenced to 5 years of imprisonment for conspiracy to defraud the United States, 5 years on each of 9 mail fraud convictions, 5 years on each of 2 tax evasion convictions, 1 year on each of 2 failure to file convictions, and 3 years on each of 2 convictions to impede. The sentences for conspiracy, tax evasion and the 9 mail fraud counts were to be served concurrently, as were the sentences for failure to file. The sentence on the two tax evasion counts and the two failure to file counts totals 5 years. The two 3 year sentences for corrupt endeavor to impede were to be served concurrently to each other but consecutively to the other sentences to the extent necessary to produce a total sentence of 7 1/4 years.

Coltrane was sentenced to 5 years for a conspiracy to defraud the United States and 1/4 year imprisonment on one count of mail fraud, the sentences on the other counts of mail fraud to be served concurrently. Carpa was sentenced to 4 3/4 years on conviction of conspiracy to defraud the United States.

The defendants appeal.

### ANALYSIS

■ All defendants contend that they were denied the right to confront the witnesses against them when Agent Durrette read to the jury excerpts from material found in the defendants' files.

The following are from the excerpts read aloud to the jury by Agent Durrette: (The

excerpts are exact, but not given in full; the authorships and dates are as read.)

1. "Some so-called tax protesters are making speeches and offering seminars around the country at which serious misrepresentations about the tax laws are being presented to the public as fact." Fact Sheet.

2. "Indeed, it is strange how the mind justifies things. For example, the way you justify 'untaxing' people by blatantly misrepresenting the truth about your so-called 'untaxing' program for the sole purpose of lining your pockets with unsuspecting victim's hard earned money while you sit idly by and watch the Franchise Tax Board and Internal Revenue Service come in and steal everything they have—knowing full well that this will be the outcome." Letter from Shawn O'Connor, 7/6/92.

3. "Why would I send you a check for $8,745 when you have not got the lien off my home?" Letter from Curtis Howard, 5/29/91.

4. "To date, the Pilot Connection System has not given any relief and has only compounded my tax problems. On the basis of fraud, I herewith demand the return of my $2,000 plus $499." Letter, 6/3/91.

5. "[The failure to succeed in not paying taxes] makes our statement, 'stop paying taxes permanently and legally' far from being the truth." Letter from Hugh Bodey, 7/6/91.

6. "You did not 'untax me legally and permanently' as promised—and, I am confident, that if and when I have to go to court, you would drop me as you have others that I am hearing about." Letter from Hugh Bodey, 8/10/91.

7. "The program was sold to me under, what I now consider false pretenses. In fact, I would go so far as to say it was out and outright fraud." Letter from Roger Hawks, 8/12/91.

8. "Due to the facts provided to us by you, some of which we now know to be out and out lies, we signed on with your organization." Letter from Arthur and Donna Fuller, 8/15/91.

9. "Bob Kane [a lawyer] told our company attorney (see memo) that I had a zero percent chance of ever eventually winning against the IRS." Letter, 8/16/91.

10. "Despite all the Pilot Connection's and Greg Galaski's efforts, I was given two options by a federal judge: I could comply with the court's order in person or at the IRS office, or I could comply from the adult detention center in downtown Los Angeles."

"I am asking nothing of the Pilot Connection now, Darrell, because I don't believe in it anymore. The only thing I have asked is that Don Held make good on his promise to give me back the money I paid him if the untax program didn't work." Letter from Dan Barwick, 8/3/91.

11. "When I joined the Connection I thought they had found that simple key to avoid taxes and a 'voluntary' part of the IRS system, if people qualified. As it appears now it doesn't work so I have decided to look for work elsewhere." Letter from Ogden Kraut, 8/15/91.

12. "When I joined the Pilot Connection, I believed what I was told and being naive about patriot issues didn't have the knowledge to spot defects and lies in your program." Letter, 10/14/91.

13. "I am in a situation now that I have no income and I had to borrow the $4,000 that I paid to the Pilot Connection and I've received nothing but broken promises and lies." Letter, 11/1/91.

14. "When I first became involved with your group I believed what you were saying was true and factual. But the longer I used the Pilot Connection's system the more it becomes evident the system does not work."

"You have been dishonest in your allegations and letter process and I feel that I cannot do business with anyone or any company or group that is deceitful."

"You have fraudulently taken money from me and at this time I wish to have all monies returned to me." Letter, 11/29/91,

15. "I cannot sell a bill of goods to someone that I can't even deliver for myself and my wife. We did not have a problem

when we started this program, but we seem to be developing one and my wife is really scared, because she is afraid of going to jail and losing her job where she has 26 years service and has only 4 years to go before retirement." Letter from Darrell Hoover, 12/18/91.

16. "We have found, in doing further research, at the law library, that your organization is teaching incorrect principles dealing with some very serious legal matters." Letter from Robert and Leah Aycock, 12/18/91.

17. "I don't think you realize the sad situations a lot of us are in. You talk a good line over the phone, but where's the beef?" Letter to Pilot Connection/Phil Marsh.

18. "We have done everything in the pamphlet plus every step Jim Caler said and still problems. Federal and state has attached both of our wages again, but this time the interest and penalties are even higher.... Take us off the Pilot Connection." Letter, 1/22/92.

19. "This is our letter of resignation due to the fact that I believe your material and system of removing people from state and federal taxes is fraudulent." Letter, 3/2/92.

20. "I paid you $15,000 to take care of my liens and levies and I expect to see this accomplished. I have become very insecure with the lack of performance." Letter, 2/5/92.

21. "Now I don't know what I have to do. I still have a lien against me. They still did not remove the lien." Letter, 2/25/92.

22. "Everything we have been told has been wrong and we no longer have any confidence with you and your organization." Letter, 5/16/92.

23. "I learned that the rest of your stupid arguments are 'frivolous' arguments. I call them 'stupid' because the courts are getting pissed off. They told us [patriots] over and over that these are frivolous arguments that they don't want to hear any more. They take the attitude, and rightly so, that we are wasting their time, and the taxpayers' money, with arguments that have repeatedly lost.

They have no patience with people using these stupid arguments." Letter from Roy Buchanan.

24. "I am writing to express my disappointment in your 'untaxing' program. ... I also followed your lien and levy procedures, but to no avail. I still have a tax lien on file and levy notices still follow me." Letter from Les Johnson, 8/11/92.

25. "[My attorney said] that the package was not legally sound for me." Letter from Michael Hutton, 9/9/92.

26. "According to this final notice, I do not believe that I have been untaxed by the Pilot Connection." Letter dated 9/28/92.

27. "Your untax program costs me $1,100 and was absolutely worthless. ... Thanks a lot for wasting my hard-earned retirement savings." Letter from David Mayo.

28. "Upon further investigation and study I have found your information to be incomplete and misleading. The damage done as a result of placing my hope and trust in you has created a complexity of criminal violations that could cost me my family, home, business and, most importantly, my personal freedom." Letter from Ina Gregory, 10/1/92.

29. "He inferred that the IRS does not pay attention to the notice of revocation and other strategies used by the Pilot Connection. That I might end up paying the IRS and the P.C., that the Pilot Connection was a scam and Phil is mainly out to get people's money." Letter, 10/28/92.

30. "What kind of people are you anyway? You take my money and your organization does not perform what you promise and then become abusive and threatening to me? ... I also want my $3,500 back A.S.A.P." Letter dated November 1992.

31. "I have talked at length with people in my town about all that I read in your book. And most of the response I have gotten is—'sure, I know someone honest tried this and they are serving time in Leavenworth.'" Letter, 11/1/92.

32. "Pilot Connection Society has made false claims to its untaxed members, which has misled them and also places them and their families in jeopardy of being convicted of tax evasion." Letter dated 11/18/92.

33. "They levied my wages anyway. What kind of bull is this? I would like my $1,500 refunded. How can you folks in good conscience keep on with this crap? Like I said, I do want a refund. Because you did nothing at all to earn the $1,500. It seems to be a big joke." Letter from Chris Yost.

34. "This letter will serve as my formal resignation from the Pilot Connection Society; effective upon receipt. My decision to enter into an agreement with your organization was based on misrepresentations made by you and your employees. The assistance and services I was led to believe I would receive was never provided. I have witnesses and proof of this fraud." Letter from Ed Maxime.

35. "In today's trial, the judge looked at the P.C. material I had included in my brief .... The judge ridiculed it; said that all of those types of approaches had long since been tried and rejected." Letter from Albert Baxter, 12/8/92.

36. "You have claimed to have 'untaxed' in excess of 17,000 people of which surely 1 percent would have received the letters from the IRS .... I am not asking for even 1 percent of documented proof of these letters but only of 1/2 percent of documented proof which would be 85 letters. (I don't even believe that you can provide 10 percent of that.)" Letter, 1/13/93.

37. "We trusted Liberty Foundation (Pilot Connection) only to realize that our 3 and a half year battle with the IRS was all for nothing. It disrupted our lives. During wage garnishments we had no money. Try explaining to the children why there won't be any Christmas. Sob stories to you, real life to us. We lost a lot of money by trusting in the Liberty Foundation. Worse than that, we lost our liberty, the very thing your company offers." Letter 11/3/93.

The government argues vigorously that this mass of accusations was admissible because the jury was instructed that the accusations were admitted not for the truth of the statements but to show the state of mind of the defendants. That was certainly the government's rationale. The difficulty with the government's position is that the jury was not instructed to limit its consideration to the defendants' state of mind. In its brief on appeal the government points to a statement of the court made on November 20 in reference to a document then read to the jury. This instruction has no apparent relevance to the documents read to the jury on November 9. An examination of the record on November 9 shows that, after being reminded of the defendants' in limine motion, the trial court told the government to proceed. At this time, at the start of Durrette's reading, the jury was given no instruction whatsoever as to its purpose or limits.

Both the prosecution and defense counsel stated that they had "cautionary instructions" to offer. The government said its was the instruction that the court had given during the initial jury instructions. The court, in fact, gave no instruction, so we are uncertain what was offered on November 9. However, we have reviewed the preliminary jury instructions to see if they did contain relevant cautionary words. The most relevant of these instructions are as follows:

> Evidence may be introduced for the limited purpose of establishing that the defendants were aware of materials that expressed opinions in conflict with those expressed by the Pilot Connection Society regarding the success of a tax-related program marketed by the tax—by the Pilot Connection Society. Before you may consider any such evidence against a particular defendant, you must find that the defendant knew of the existence of these materials or their contents. (Tr. 11/2/95, vol. 2, at 143.)

> An intent to defraud may be demonstrated by the scheme itself. Similarly, the defendant's knowledge of a false statement or his or her reckless indifference to the truth or falsity of that statement can

demonstrate an intent to defraud. (*Id.* at 149.)

In determining whether or not the government proves that a defendant acted with an intent to defraud and to obtain money or property by means of false promises or statements or whether the defendant acted in good faith, you must consider all of the evidence in the case bearing on the defendant's statement. (*Id.* at 150.)

None of these instructions limit the jury's consideration of material from the files for the truth of what is contained in them.

The first time that the court told the jury why the documents were being read—sometime into the reading—the court said, "And it's clear from the court's instructions to the jury—and, ladies and gentlemen, if any of you have any questions, please let me know. But it's clear that the documents themselves are the evidence. And they are being introduced to show what documents were at the various locations at the various times that the witness testified about." A little later in response to another objection from the defendants, the court said: "This is a document in the files of the Pilot Connection Society found on the date indicated, and that's what the document is being offered for. Again, is there any question that any juror has that that is the evidence which is being offered?" Neither of these instructions tells the jury not to consider the truth of the matters read.

The first time an instruction on the defendants' state of mind was given was in reference not to accusations against TPCS but to an objection to Durrette reading from an IRS tax manual found in the files: "The court is permitting the government to argue cases that have been overruled as a matter of law and citing legal principles that are no longer valid as if that's notice of anything, and to that I most strenuously object and move to strike." The court responded: "Well, the objection is overruled. This is clear this is an IRS tax manual. The exact current status of the propositions of law referred to in the manual are not issues for the jury to decide. They are not necessarily part of the instructions. What this is being offered for is a document which was in the files at the place and at the time indicated by Mr. Durrette. And that bears on it being offered with respect to the intent issues in this case

vis-a-vis the present defendants. But we are not here to argue the law." (Tr. 11/9/95 at 78–79.) This instruction only indicates the purpose of the reading of material on the tax laws.

To the next objection by defendants the court said: "Counsel, I have been very patient this morning. Perhaps that's a change in my attitude, but I am beginning to lose patience. You have made a number of objections to this evidence. I have ruled on these. It's clear what the evidence is being offered for. The jury has been repeatedly instructed on this. The jury has been told that what they are receiving are excerpts of documents that are being admitted into evidence, and for illustrative purposes Ms. Teters and the witness are going through and pointing out certain things that the government contends are of significance. Now, it's quite clear what is going on, and it need not be a process that is periodically punctuated by speechifying by lawyers. Your objections are preserved, and so there isn't any need for undue interruption and prolongation of this process."

The first time any instruction regarding complaint letters or similar materials was given was much later in Durrette's testimony when he read from a *Clarion Ledger*, Jackson, Mississippi, editorial dated March 28, 1990, which stated: "Tax protesters become a part of the con job that is played on the American people." Counsel for the defendants objected: "I am at a loss as to exactly what these editorial comments are providing notice of except the opinion of someone who wrote an editorial . . . ." The court responded: "This is simply being offered for the state of mind of the defendants." (*Id.* at 111–12.) Much later in Durette's reading, a letter of Rudy and Gloria Medina resigning from TPCS was read followed by a complaint letter dated September 3, 1991. The defense again objected to these letters as hearsay. The court stated again: "Well, as we discussed in the past, this is being offered for the state of mind of the defendants." (*Id.* at 185.)

It is apparent from this review that on three occasions the jury was told that particular documents being read related to the

defendants' "intent" or the defendants' "state of mind." At no time was the jury instructed that they were not to consider the accusations as conveying truth about the facts alleged in them. At no point was the jury told that these were limiting instructions which confined the way they must look at the evidence.

In the first of the rulings that responded to defense objections, twice repeated, the court told· the jury merely that the documents being read had been found at TPCS headquarters. The court assumed that instructing the jury that what was being established by the reading was that the documents were found at TPCS headquarters operated as a restraint on the jury's use of the documents. But for all the jury was instructed, it could do whatever it wanted with what was found at TPCS headquarters.

If these accusations were to be admitted, it was incumbent on the court to give clear instruction to the jury distinguishing what they could treat as showing the knowledge of defendants and what they could not treat as evidence of ·crime. Aside from the three brief and particular references cited above,· no instructions at all were given on this vital point. The three brief references were entirely insufficient to clarify a concept that even for lawyers is not an easy one—the difference between taking a statement for its truth value and limiting it simply to the effect of the statement on the mind of the person exposed to it. Even to a person trained in the law it takes a mental effort of some magnitude to hear a letter strongly manifesting the mind of the letter-writer as to the truth of events the letter-writer says have happened and to distinguish between the asserted truth and the effect of the communication on the mind of the recipient of the letter. There are cases in which such letters have been admitted to show the knowledge of the recipient, *see, e.g., United States v. Lasky,* 600 F.2d 765, 769 (9th Cir. 1979); *United States v. Farkas,* 935 F.2d 962, 965 (8th Cir.1991), but always with a clear instruction that the letters should not be considered for the truth of the matters contained therein. Without such limitation the accusations act as testimony against the defendants.

The instructions ultimately given the jury as it retired did not cure the omission. The jury was told that only defendants who knew or "should have known" of the documents should be charged with notice of their contents. This instruction in no way limited the jury in considering the truth of the contents. The jury was also told that it should observe any limiting instructions that had been given in the course of the trial. No instructions had been given telling the jury that it could not take the truth of the 37 accusations enumerated above into account.

■ The government does not argue that the defendants waived their Confrontation Clause objection by not raising it again when the final instructions were prepared. The defendants were not obliged to object again when they had made their in limine motion and formally presented it to the court which disregarded it and which rebuked the defendants with some asperity when they raised the objection again during Durrette's testimony. The defendants did not have to perform a vain act.

As Durrette read material into the record unlimited in its bearing, abundant hearsay was presented to the jury. The right secured to the defendants by the Sixth Amendment was violated. The right to cross-examine one's accusers is fundamental in our system of justice. *Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). Cross-examination is "the principal means by which the believability of a witness· and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

■ When a constitutional right is violated by trial rulings, we are bound to determine whether the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government here had a strong case based on the contents of the Untax Packages that the defendants put together and promoted. The defendants had a not very plausible defense that TPCS was an educational enterprise exercising its right to free speech. If that defense was to have any chance of creating a reasonable doubt in the jurors' minds, the jurors had to credit the

defendants with honesty. The hearsay accusations destroyed that chance. Taken as true, as the jury was allowed to take them, the accusations established that the defendants were hypocrites, liars, callous exploiters of their victims, operators of a major scam.

The 37 accusations were overwhelming evidence of the scheme of mail fraud charged in the indictment and exemplified in the particular mail fraud counts. The three live witnesses to mail fraud that the government produced were David Anderson, who admitted to having embezzled taxes he withheld from his employees before he had any contact with TPCS; Debbie Long, whose disillusionment with TPCS came when the State of California levied on her wages; and Clifford Koeper, who believed that the Untax Package did not work but became an Associate Member of TPCS and sold the Untax Package to two others. The burden of the government's mail fraud case was carried largely by the accusations read into the record. When the government on appeal states there was "ample evidence the TPCS members did *not* get what they paid for," (Appellee Br. at 46) (italics in original), and that "there is no better proof of the fact that TPCS members did not get what they paid for than the testimony of the victims," (*Id.* at 47), the government does not cite the testimony of Anderson, Longer, and Koeper, but appears to invoke all the accusations that became part of what the jury had before it.

The evidence proving the existence of a scheme to commit mail fraud was linked to the evidence proving the conspiracy to defraud the United States. Count One of the indictment listed the fraudulent recruitment of taxpayers by TPCS as overt acts carrying out the conspiracy. Addressing the jury in closing arguments, the government specifically urged that the defendants' deceitful recruiting of TPCS members was proof of the conspiracy to defraud the United States ("they lie as to how many people have been successfully untaxed, they lie as to the numbers of people in the organization, and the effectiveness of their methods"). The government immediately added: "The instructions that the judge has given you are that you need only find that one overt act, as listed in the indictment, was committed in

furtherance of the conspiracy that's alleged there."

The accusations of fraud on the TPCS members proved, or could have been taken by the jury as proving, both the mail fraud counts and the conspiracy count. It is difficult for us to determine beyond a reasonable doubt that they did not function in this way. When you hear that defendants have told out-and-out lies, run a scam, and used false pretenses, and you are not limited in how you can use this evidence, it would be entirely natural to credit the accusations so vigorously advanced as true. In confirmation of this conclusion is the difference in the outcome of the two trials. When the government had to produce a number of live witnesses who were themselves tax cheats, the jury hung. With these inconvenient witnesses eliminated, the jury convicted. The palpable difference in result makes likely that the change of evidence to the presentation of hearsay tipped the scales. We cannot say beyond a reasonable doubt that the violations of the Confrontation Clause did not produce this result. The convictions of the Marshes, the Spencers and Coltrane of mail fraud and of conspiracy to defraud the United States must be set aside.

■ Carpa presents a different case. The jury was explicitly instructed not to consider against him the letters read from the files. The jury is presumed to have obeyed this instruction. However, the letters went very far to show that TPCS was a criminal conspiracy, and the existence of this conspiracy had to be proved in order to make Carpa a conspirator. The reversal of the convictions of the Marshes, Spencers, and Coltrane for conspiracy leaves Carpa without other convicted conspirators and with proof of his part in a conspiracy dependent on the evidence showing TPCS to be a conspiracy. Under these circumstances, Carpa's conviction of conspiracy must also be reversed.

*The Commercial Liens.* The filing of baseless liens to harass government officials has become a standard tax protestor ploy. The liens are easy to file and not easy to remove. No judge or other officer of the government would like to have them filed on his or her property. They bear the mark of malice, as they do in the case where they

appear as a mean response to a lawfully authorized search. Nonetheless, the crime can be punished only in accordance with law.

█ The indictment charged that the Marshes "did corruptly endeavor to intimidate and impede" certain officers of the United States by the filing of the liens in Nevada and Washington. The officers were located in the Eastern and Northern Districts of California. None were in Nevada or Washington. The liens were mailed for filing from the Eastern District of California. The question was put to the jury whether venue for the crime could be found in the Northern District. The jury's verdict of guilty so found. The affected defendants challenge the finding.

The government's argument is that an effect of the filing of the liens was an impact on the IRS officers in San Jose, California, who were conducting a criminal investigation of the defendants. The government invokes *United States v. Angotti*, 105 F.3d 539 (9th Cir.1997) (venue for the prosecution of the crime of making a false statement in violation of 18 U.S.C. § 1014 lies where the crime is completed by the statement having effect). The problem with *Angotti* as analogy is that the crime of endeavoring to impede the IRS is complete when the endeavor is made. The government did not have to show that its agents abandoned their investigation or even that the agents were anxious about the effect of the liens on their credit. No effect need be proved. The filing of the lien is the crime. The government itself presented this exact description of the crime to the jury in its closing argument: "All you have to find is that there was an attempt. Because that's what a corrupt endeavor is." (Tr. 12/8/95 at 11.) The jury could not find that any step to complete the crime was taken in the Northern District of California when the criminal deeds had already been committed. Venue as required by the Sixth Amendment was lacking. The convictions on these counts must be set aside.

█ *Waivers.* Two issues now raised by the defendants were waived at trial. On the face of the indictments the venue of the tax counts was wrong: the Marshes and Spencers had been residents of the Eastern District of California, but they were being tried in the Northern District. The defendants said not a word about the venue until they were convicted. They now contend that the government might have proved some act in the Northern District that would have related to the tax courts and justified the venue; they could not know till the trial was over. The defendants waited too long. They cannot sandbag the government after the verdict is in. *United States v. Powell*, 498 F.2d 890, 891–92 (9th Cir.1974).

█ Phillip Marsh earnestly urges that the exclusion of the evidence of his psychological state was error in the light of our en banc decision in *United States v. Morales*, 108 F.3d 1031 (9th Cir.1997), which he characterizes as establishing a new constitutional rule that should be applied retroactively. *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). *Morales* did not announce new constitutional doctrine but applied the Federal Rules of Evidence. Marsh cannot benefit from the case retroactively. He waived his right to introduce the psychiatrist's testimony by not seeking to introduce it in the second trial. We find no plain error.

Other issues raised by the defendants need not be considered in view of our ruling on the principal counts.

### SUMMARY

The convictions of all six defendants of violation of 18 U.S.C. § 371 are **REVERSED.** The convictions of the Marshes and Jill Spencer of endeavoring to obstruct the administration of the tax laws are **REVERSED.** The convictions of the Marshes and the Spencers and Coltrane of mail fraud are **REVERSED.** The convictions of the Marshes and the Spencers of failure to file and of tax evasion and the sentences for these offenses are **AFFIRMED.**