**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

AHMAD ABOUAMMO,

*Defendant-Appellant*.

No. 22-10348

D.C. No.
3:19-cr-00621-
EMC-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted May 16, 2024
San Francisco, California

Filed December 4, 2024

Before: Kenneth K. Lee and Daniel A. Bress, Circuit
Judges, and Yvette Kane,[*] District Judge.

Opinion by Judge Bress;
Concurrence by Judge Lee

[*] The Honorable Yvette Kane, United States District Judge for the
Middle District of Pennsylvania, sitting by designation.

## SUMMARY[**]

## Criminal Law

The panel affirmed Ahmad Abouammo's convictions for acting as an unregistered agent of a foreign government or official, 18 U.S.C. § 951; conspiracy to commit wire and honest services fraud, 18 U.S.C. § 1349; wire and honest services fraud, 18 U.S.C. §§ 1343, 1346; international money laundering, 18 U.S.C. § 1956(a)(2)(B)(i); and falsification of records to obstruct a federal investigation, 18 U.S.C. § 1519.

Abouammo, an employee at the company then known as Twitter, allegedly provided confidential information about dissident Saudi Twitter users to Bader Binasaker, a close associate of Saudi Crown Prince Mohammed bin Salman. In return, Abouammo received a lavish wristwatch and hundreds of thousands of dollars in payments from Binasaker. A jury convicted Abouammo for his role in this arrangement and his efforts to cover it up.

Abouammo argued that the evidence was insufficient to convict him under § 951, for acting as an unregistered agent of a foreign government or official, because Binasaker was not a foreign "official." The panel concluded that it is unnecessary to resolve this issue because an alternative theory—that Abouammo acted at the behest of a foreign government—sufficiently supports the jury's verdict. Regardless, a rational jury could conclude that Binasaker

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was a foreign "official" even under Abouammo's narrow construction of that term.

Abouammo challenged his convictions for money laundering and wire fraud as time barred. Rejecting this challenge, the panel held that when the government secured a superseding indictment within six months of the dismissal of an information filed within the limitations period, the government complied with 18 U.S.C. § 3288, which, with one exception not applicable here, categorically excludes from "any statute of limitations" bar a "new indictment . . . returned in the appropriate jurisdiction within six calendar months" of the dismissal of an "information charging a felony." The superseding indictment was therefore timely.

Abouammo argued that his conviction for falsification of records with intent to obstruct a federal investigation in violation of § 1519 should be dismissed due to improper venue. Rejecting this argument, the panel held that a prosecution under § 1519 may take place in the venue where the documents were wrongfully falsified or in the venue in which the obstructed investigation was taking place. Abouammo's act of making a false document "with the intent to impede, obstruct, or influence" a federal investigation continued until the document was received by the person or persons whom it was intended to affect or influence. Here, the document was received by FBI agents working out of the FBI's San Francisco office, so venue in the Northern District of California was proper.

In an accompanying memorandum disposition, the panel vacated Abouammo's sentence and remanded for resentencing.

Concurring, Judge Lee agreed with Judge Bress' opinion, including his analysis of why Abouammo's venue

argument fails under circuit precedent. He wrote separately to highlight that the decision does not give free rein to the government to manufacture venue and that the court should scrutinize potential fig-leaf justifications in future cases.

## COUNSEL

Jeffrey M. Smith (argued), Appellate Counsel; Matthew G. Olsen, Assistant Attorney General for National Security; National Security Division, United States Department of Justice, Washington, D.C.; Eric Cheng, Colin C. Sampson, Merry J. Chan, Assistant United States Attorneys; Ismail J. Ramsey, United States Attorney; United States Department of Justice, Office of the United States Attorney, San Francisco, California; for Plaintiff-Appellee.

Carmen A. Smarandoiu (argued) and Angela Chuang, Assistant Federal Public Defenders; Jodi Linker, Federal Public Defender; Federal Public Defenders Office, San Francisco, California; for Defendant-Appellant.

## OPINION

BRESS, Circuit Judge:

Ahmad Abouammo, an employee at the company then known as Twitter, allegedly provided confidential information about dissident Saudi Twitter users to a close associate of Crown Prince Mohammed bin Salman of the Kingdom of Saudi Arabia. In return, Abouammo received a lavish wristwatch and hundreds of thousands of dollars in payments from his Saudi contact. For his role in this arrangement and his efforts to cover it up, a jury convicted Abouammo for acting as an unregistered agent of a foreign government or official, 18 U.S.C. § 951, conspiracy to commit wire and honest services fraud, 18 U.S.C. § 1349, wire and honest services fraud, 18 U.S.C. §§ 1343, 1346, international money laundering, 18 U.S.C. § 1956(a)(2)(B)(i), and falsification of records to obstruct a federal investigation, 18 U.S.C. § 1519.

We affirm Abouammo's convictions but vacate his sentence and remand for resentencing.[1]

### I

### A

In 2013, Twitter hired Abouammo, a U.S. citizen, as a Media Partnerships Manager for the Middle East and North Africa region. In this role, Abouammo was to help onboard influential content creators to Twitter and serve as a liaison to persons of influence in his geographic territory. At this

---

[1] This opinion addresses Abouammo's challenges to his convictions. In an accompanying memorandum disposition, we address Abouammo's sentence.

time, the Kingdom of Saudi Arabia (KSA) had fifty percent of Twitter's users in the region, and it was identified as a key prospect for growing Twitter's business.

In June 2014, a group of Saudi entrepreneurs visited Twitter's offices in San Francisco. Abouammo arranged a tour for the group. During the visit, Abouammo met Bader Binasaker, a close associate and "right-hand-man" of Saudi Crown Prince Mohammed bin Salman ("MbS"). MbS is a son of now-King of Saudi Arabia Salman bin Abdulaziz Al Saud. In March 2013, MbS's father was the Crown Prince, the second most powerful position in the Kingdom, and MbS was named Head of the Private Office of the Crown Prince. In January 2015, MbS's father became King, appointing MbS as Minister of Defense and Head of his Royal Court. In April 2015, King Salman named MbS Deputy Crown Prince.

Binasaker was a close advisor to MbS. Binasaker was the General Supervisor of the Prince Salman Youth Center (PSYC). In 2011, MbS appointed Binasaker to be the Secretary General of the Mohammed bin Salman Foundation, a charitable organization that went by the acronym "MiSK." The government's expert at trial, Dr. Kristin Diwan, testified that these organizations were "very connected to royal power and trying to forward agendas of the particular royal or of the state." Binasaker used an email address with the official domain name of His Royal Highness Prince Mohammed's Private Office. In addition, and among other things, when Binasaker traveled with a Saudi delegation for meetings at Camp David, he submitted an A-2 visa for diplomatic travelers, describing himself as a "foreign official/employee."

After the June 2014 tour at Twitter's headquarters, Binasaker emailed Abouammo with a request to "verify" MbS's Twitter account. Twitter's verification service was generally reserved for public figures and placed a blue verification check box on their account to confirm that a particular Twitter account was actually associated with that person. Media Partnerships Managers were not directly involved in the verification process but would serve as liaisons between the verification team and the public figure. After additional verification requests, a MiSK employee contacted Abouammo "[r]egarding the arrangement between you and Mr. [Binasaker] for many things," to report an account impersonating MbS. Abouammo was generally expected to address complaints from influential Twitter users in the region that imposters were using their accounts.

In December 2014, Abouammo met Binasaker at a Twitter meeting in London. At the meeting, Binasaker gave Abouammo a luxury Hublot watch. Abouammo later attempted to sell the watch online for $42,000. At the London meeting, Binasaker and Abouammo spoke about a widely followed Twitter account with the handle @mujtahidd. The @mujtahidd account was an "infamous and colorful" persona in Saudi Arabia that tweeted about alleged corruption and incompetence in the Saudi Kingdom and royal family.

After Abouammo returned from London, he received an email from Binasaker that read: "salam brother as we discussed in london for Mujtahid file." Attached to this email was a dossier describing the @mujtahidd account as "established on July 2011 under an anonymous name with [the] aim of speaking out some confidential information and leaking some hidden facts about Saudi Arabia and royal family." The document asserted that @mujtahidd violated

Saudi law by slandering the royal family and igniting false rumors about them.

Twitter records show that Abouammo used an internal Twitter tool called "Profile Viewer" to repeatedly access the @mujtahidd account, beginning shortly after he met Binasaker in London in December 2014 and continuing through February 2015. Profile Viewer allowed Abouammo to search for specific Twitter users by their usernames and view their confidential personal identifying information, including the users' email addresses, phone numbers, and IP addresses. Twitter's records show that on various occasions Abouammo accessed the email and phone information associated with the @mujtahidd account. In February 2015, Binasaker emailed Abouammo about another account, @HSANATT, which had been suspended for impersonating a Saudi government official. Twitter's records show that Abouammo accessed confidential personal information of the @HSANATT user in February 2015.

During this period, Binasaker and Abouammo communicated using WhatsApp, an end-to-end encrypted messaging platform. The content of those messages was not recovered. But the government claimed that circumstantial evidence showed Abouammo used WhatsApp to forward the confidential information of dissident Saudi Twitter users to Binasaker. In a post-trial order, the district court concluded that while "[t]here is no direct evidence that [Abouammo] conveyed the information he accessed to Binasaker," "[t]here is a significant amount of circumstantial evidence."

In February 2015, a month in which Abouammo had viewed @mujtahidd and @HSANATT in Profile Viewer, Binasaker wired $100,000 to a bank account in Lebanon that Abouammo recently opened under his father's name. On a

visit to Lebanon later that month, Abouammo withdrew $15,000 from the account and transferred some of the money to his own Bank of America account.  In March 2015, the day after speaking with Binasaker, Abouammo messaged Binasaker the following note: "proactive and reactively we will delete evil my brother."  Binasaker responded with a thumbs up emoji.

During sentencing in this case, the district court heard testimony from the sister of a man who worked as a humanitarian worker for the Red Cross in Saudi Arabia.  The man used a Twitter account to tweet satire critical of the Saudi government.  The witness testified that her brother was detained in Saudi Arabia due to the Twitter account, held in solitary confinement, and tortured through electric shocks and beatings.  The man was hospitalized with life threatening injuries and has since disappeared.

## B

Abouammo left Twitter in May 2015 and moved to Seattle, where he started a freelance social media consultancy.  Through his new venture, Abouammo introduced Saudi contacts to Twitter employees, serving as an intermediary to follow up on issues such as verification requests.  In July 2015, Binasaker wired another $100,000 to Abouammo's father's Lebanese bank account, sending Abouammo a note saying he was "sorry for the delay in the transfer."  Binasaker sent another $100,000 wire transfer to Abouammo in January 2016.

On October 20, 2018, the New York Times published an article describing how advisers to MbS had mobilized against critics on Twitter.  The article reported that Twitter was warned in late 2015 that Saudi Arabian operatives had groomed a Twitter employee, Ali Alzabarah, to look up the

confidential identifying information of certain Twitter accounts critical of the Saudi government. Alzabarah had repeatedly accessed the @mujtahidd account after meeting with Binasaker in May 2015. After Twitter questioned Alzabarah about his repeated access of the account, Alzabarah and his family fled to Saudi Arabia, where he secured employment with MiSK.

Notified that the New York Times would be publishing this article, which would reveal the government's ongoing investigation, the FBI flew two agents from the Bay Area to Seattle the night before the article's release. The same day the article was published, the agents went to Abouammo's residence in Seattle to try to speak with him. They found Abouammo on the driveway of his home.

After they identified themselves as "FBI agents from the San Francisco office," Abouammo immediately asked if they were there about the New York Times article. After briefly discussing the article, Abouammo said "something to the effect of he felt bad because he had introduced Ali Alzabarah to KSA officials," specifically Binasaker. Moving into the house to continue the discussion, the FBI agents spoke with Abouammo for several hours. During the course of the interview, Abouammo told the agents that he presumed Binasaker was close to MbS, that he knew Binasaker was part of the King's team, and that Binasaker worked for MiSK and PSYC, which were both entities that, according to Abouammo, were owned or controlled by the Kingdom of Saudi Arabia.

Abouammo informed the agents that he had met with Binasaker in London, Dubai, and Riyadh, and that Binasaker had gifted him a watch that was "plasticky and cheap and worth approximately $500." Abouammo recalled that

Binasaker was interested in the @mujtahidd account and had repeatedly asked Abouammo to access it. Abouammo admitted he accessed the account but denied that he passed any private user information to Binasaker. Abouammo also described how Binasaker was unhappy when Abouammo decided to leave Twitter, telling the agents that one of the reasons he left the company was the "mounting pressure" from contacts in the Saudi government.

Abouammo told the agents that he continued to assist Binasaker after he left Twitter and was paid $100,000 for his services. When the agents asked Abouammo if there was documentation to support this claim, Abouammo said he had retained an invoice. Abouammo told the agents the invoice was on his computer, and he went upstairs to retrieve it while the agents waited on the first floor.

Several minutes after going upstairs, Abouammo emailed the agents an invoice that had nothing to do with Binasaker or MiSK. Nearly thirty minutes later, as the agents continued to wait downstairs, Abouammo sent a second email with an attachment purporting to be an invoice for work performed for MiSK, which showed $100,000 billed for one year of social media consulting. The metadata of the two invoices showed that although the first invoice was created months before, the supposed MiSK invoice was created during the thirty-minute period that Abouammo was upstairs.

## C

In November 2019, a Northern District of California grand jury returned an indictment against Abouammo for one count of acting as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951, and one count of falsifying

records in a federal investigation, in violation of 18 U.S.C. § 1519.[2]  In February 2020, the parties agreed to a tolling agreement to pursue a possible plea deal.  Under the tolling agreement, the statute of limitations was extended to April 7, 2020.

March 2020 marked a sudden halt in court proceedings due to the COVID-19 pandemic.  The district court accordingly suspended grand jury operations.  On March 31, 2020, the government asked the defense for another tolling agreement.  The defense declined.  As a result, on April 7, 2020, the government filed a superseding information adding fifteen counts of wire and honest services fraud, 18 U.S.C. §§ 1343, 1346, one count of conspiracy to commit wire and honest services fraud, 18 U.S.C. § 1349, and three counts of international money laundering, 18 U.S.C. § 1956.  After grand jury proceedings resumed, the grand jury in July 2020 returned a superseding indictment that contained the same charges as the April 2020 information.

The district court denied Abouammo's motion to dismiss the document falsification charges on grounds of improper venue, and it likewise denied Abouammo's motion to dismiss the wire fraud, conspiracy, and money laundering charges as untimely under the statute of limitations.  After a two-week jury trial, Abouammo was convicted on six counts of the superseding indictment: acting as an agent of a foreign government, conspiracy to commit wire fraud and honest services fraud, wire and honest services fraud, two counts of international money laundering, and falsification of records in a federal investigation.  The jury found Abouammo not guilty of five other counts of wire fraud and honest services

---

[2] The grand jury also indicted Alzabarah and Ahmad Almutairi, the managing director of a Saudi social media company.

fraud. The district court denied Abouammo's motion for judgment of acquittal and motion for a new trial.

Grouping all counts except the § 951 conviction, the district court determined that Abouammo's advisory Sentencing Guidelines range was 70 to 87 months in prison. The district court sentenced Abouammo to a below-Guidelines sentence of 42 months in prison (42-month concurrent terms for each count), three years of supervised release, and forfeiture of $242,000.[3]

Abouammo timely appealed his convictions and sentence, although he does not challenge his conviction for conspiracy to commit wire fraud. We have jurisdiction under 28 U.S.C. § 1291. We address Abouammo's challenges to his convictions in the order he raises them.

## II

Abouammo first argues that the evidence was insufficient to support his conviction for acting as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951.

We "review de novo the sufficiency of the evidence, including questions of statutory interpretation." *United States v. Grovo*, 826 F.3d 1207, 1213 (9th Cir. 2016). "In doing so, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1213–14; *see also Jackson v.*

---

[3] The district court determined there was no Guidelines provision for Abouammo's § 951 conviction for acting as an unregistered agent of a foreign government or official. However, the court concluded that a 42-month concurrent sentence for that conviction was independently warranted under 18 U.S.C. § 3553(a).

*Virginia*, 443 U.S. 307, 319 (1979). We "presume that the trier of fact resolved any conflicting inferences from historical facts in favor of the prosecution, and then determine whether the evidence, thus viewed, could have led *any* rational fact-finder to find the defendant guilty." *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (citation omitted).

We hold that sufficient evidence supports Abouammo's § 951 conviction.

## A

Under 18 U.S.C. § 951(a), "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General . . . shall be fined under this title or imprisoned not more than ten years, or both." Under § 951(d), "the term 'agent of a foreign government' means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." Section 951 contains some exceptions that are not directly implicated here. *See id.* § 951(d)(1)–(4). An implementing regulation, 28 C.F.R. § 73.1(b), defines "foreign government" to

> include[] any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group or agency to which such

> sovereign de facto or de jure authority or functions are directly or indirectly delegated.

Section 951 originates from the World War I-era Espionage Act of 1917. *See United States v. Chaoqun*, 107 F.4th 715, 727 (7th Cir. 2024); *United States v. Duran*, 596 F.3d 1283, 1294 & n.4 (11th Cir. 2010); *United States v. Rafiekian*, 991 F.3d 529, 538 & n.10 (4th Cir. 2021) (*Rafiekian I*). Reflecting the government's "strong interest in identifying people acting at the behest of foreign governments within its borders," *Rafiekian I*, 991 F.3d at 538, the core objective of § 951 is to "serv[e] as a 'catch-all statute that would cover all conduct taken on behalf of a foreign government.'" *Id.* at 544 (quoting *Duran*, 596 F.3d at 1294–95). Although we do not exhaustively address all of its particulars, § 951 has three essential elements: "(1) a person must act; (2) the action must be taken at the direction of or under the control of a foreign government [or official]; and (3) the person must fail to notify the Attorney General before taking such action." *Duran*, 596 F.3d at 1291.

In this case, there is no dispute over the first and third elements. The issue instead concerns the second: whether Abouammo acted "subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). Abouammo's sole argument on appeal is that the evidence was insufficient to convict him under § 951 because Binasaker was not a foreign "official." In Abouammo's view, a foreign official must "hold[] public office or otherwise serve[] in an official position in the foreign government," and Binasaker does not meet this test because he "lacked any official role or position in the Saudi government during the relevant period."

We conclude that it is unnecessary to resolve this issue because an alternative theory—that Abouammo acted at the behest of a foreign government—sufficiently supports the jury's verdict.  Regardless, a rational jury could conclude that Binasaker was a foreign "official" even under Abouammo's narrow construction of that term.

### B

We begin with why we need not resolve Abouammo's argument about the meaning of foreign "official."  The reason is that under 18 U.S.C. § 951(d), "the term 'agent of a foreign government' means an individual who agrees to operate within the United States subject to the direction or control of a foreign government *or* official."  (Emphasis added).  This disjunctive provision refers to one who agrees to act as an agent of either a foreign government or a foreign official.  Here, regardless of Binasaker's exact role in Saudi Arabia, sufficient, if not overwhelming, evidence shows that Abouammo knowingly agreed to act under the direction and control of the Kingdom of Saudi Arabia.

### 1

As we recounted above, Binasaker was a close advisor and "right-hand man" to now-Crown Prince Mohammed bin Salman (MbS), himself a high-ranking official in the Saudi government during the relevant time.  The trial testimony showed that as MbS grew in power in Saudi Arabia, Binasaker's influence grew as well.  Indeed, the evidence demonstrated that Binasaker had extensive involvement with the Saudi royal family and government.

The government provided expert testimony that in Saudi Arabia, "power stems from proximity to rule," and that the royal family "hold their own courts, basically, of people who

work for them as well within the courts." The expert further testified that MbS "has been assuming a lot more of the day-to-day rule of the kingdom and initiatives of the government" and is considered the "de facto leader" of the country. Binasaker was "very close" to MbS, "linked into" the Crown Prince's "private personal life and finances and, also, his broader agenda." The government's expert also testified that Binasaker's actions reflected the agenda and objectives of the office of MbS, and that as the "main aid[e] to the second most powerful man in the kingdom," Binasaker's actions reflected the power of the Crown Prince.

Binasaker's positions in MiSK and PSYC were tied to the ambitions and policies of the state. MiSK was "a royal-founded foundation" that was MbS's "personal foundation." It was "very high profile in the administration." Binasaker "was the secretary general of" MiSK, which was at the forefront "of the agenda that [Mohammed] bin Salman was pursuing, particularly in his political strategies." The government's expert testified that in Saudi Arabia, these types of foundations were "very connected to royal power and trying to forward agendas of the particular royal or of the state." MiSK would be connected to the royal governmental power of Saudi Arabia "by its very name" because "[i]t's connected to the current crown prince" and "[e]veryone would know that."

The government's expert further explained that MiSK took on quasi-governmental functions. MiSK "works very closely with other ministries," and the "ruling family would often bring MiSK on their main diplomatic visits abroad." MiSK's connection with MbS meant that it was recognized as a means of getting closer to the royal family, particularly because this "kind of proximity is very important in Saudi Arabia, proximity to power."

Abouammo clearly understood that Binasaker was representing the Kingdom of Saudi Arabia. Referencing communications with Binasaker, Abouammo told colleagues at Twitter that he had "built a strong relationship with the team of HRH [(His Royal Highness)] Crown Prince Salman bin Abdelaziz Al Saud," describing himself as "working with His Majesty's team" on Twitter-related matters. On the same day that he had multiple phone calls with Binasaker, Abouammo described himself as having "spoke[n] with a close person with King Salman." Years later, when FBI agents approached Abouammo at his home in Seattle, Abouammo explained how he had introduced fellow Twitter employee Alzabarah (the subject of the New York Times article) to Binasaker, whom Abouammo identified to the FBI agents as a Saudi government official. According to one of the agents, Abouammo "specifically mentioned Mr. Binasaker" when explaining that he left Twitter in part because of the "mounting pressure from contacts within the KSA government."

Finally, the government demonstrated at trial that Abouammo had specific dealings with Binasaker concerning the Twitter accounts @mujtahidd and @HSANATT, both of which were critical of the Saudi government and royal family. The evidence readily permitted the conclusion that the purpose of these interactions was to assist the Kingdom of Saudi Arabia in silencing dissident voices. The nature of the communications between Abouammo and Binasaker—concerning information of evident importance to the state—underscores that Abouammo, through Binasaker, was acting at the direction and control of Saudi Arabia. Whether Binasaker was a formal government "official," an éminence grise, or something else, he was acting for the Kingdom, and Abouammo knew this.

2

Abouammo claims there is a problem with this theory: it was never charged or tried. In Abouammo's view, the full extent of the theory advanced by the government was that Abouammo acted subject to the direction and control of Binasaker as a foreign "*official*." Expanding this to encompass Abouammo acting subject to the Saudi government *itself*, Abouammo contends, would amount to a constructive amendment of the indictment and a "fatal variance" between the evidence presented and the crime charged. *See United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017); *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014).

We are not persuaded. Count I of the superseding indictment alleged that Abouammo provided Binasaker "and others related to, and working for, the government of KSA and the Saudi Royal Family with nonpublic information held in the accounts of Twitter users." These accounts were "posting information critical of, or embarrassing to, the Saudi Royal Family and government of KSA." The indictment thus charged Abouammo under 18 U.S.C. § 951 as having "knowingly, without notifying the Attorney General as required by law, act[ing] as an agent of a foreign government, to wit, the government of the Kingdom of Saudi Arabia and the Saudi Royal Family."

Although Abouammo emphasizes the number of times Binasaker is referenced in the superseding indictment as "Foreign Official-1," the indictment also alleged that Foreign Official-1 "work[ed] for . . . the government of KSA and the Saudi Royal Family." That the government alleged and argued that Binasaker was a foreign "official" does not mean the government exclusively pursued a foreign

"official" theory at the expense of the broader theory that Binasaker acted for the Saudi government.  The theories and supporting evidence are not mutually exclusive, especially considering that Abouammo could only act at the direction and control of the KSA government through a Saudi contact. The jury instructions—which Abouammo does not challenge—reflect this reality by offering the jury both theories.  The jury was instructed, for example, that "[t]o find the defendant guilty of this offense, you must find the defendant knew that he was acting as an agent of a foreign government or an official of the KSA and knew that he had not provided prior notification to the Attorney General."

We acknowledge Abouammo's argument that in denying his motion for judgment of acquittal, the district court appears to have focused on whether the government sufficiently proved that Binasaker was a foreign "official." But the court's ruling describing Binasaker as exercising "de facto authority" over "some portion of the KSA's sovereign power" can also be read as referencing the government's more general theory that Binasaker was acting on behalf of the Saudi government, which through Binasaker placed Abouammo under its direction and control.  Regardless, our review of the sufficiency of the evidence is de novo.  *Grovo*, 826 F.3d at 1213.  After that review, we conclude that a reasonable juror could find that Abouammo, through Binasaker, acted at the direction and control of the KSA and Saudi royal family, and that the charging documents sufficiently encompassed this theory.

C

Even if we believed the government limited itself to a foreign "official" theory, we would still hold that sufficient evidence supports Abouammo's § 951 conviction.

The foreign "official" language was added to § 951 in a 1984 joint appropriations resolution.  *See* Pub. L. No. 98-473, Title II, § 1209, 98 Stat. 1837, 2164 (1984).  Forty years later, effectively no case law has seriously examined it.  We have only considered a similar sufficiency of the evidence challenge to a § 951 conviction in one other case, *United States v. Chung*, 659 F.3d 815 (9th Cir. 2011).

In *Chung*, we affirmed a conviction under § 951 based on evidence that the defendant acted "at the direction or control of Chinese officials."  *Id.* at 823.  *Chung* explained that to sustain the defendant's § 951 conviction, the government had to "establish that a Chinese official directed or controlled Defendant's actions during the limitations period."  *Id.*  We found that sufficient evidence supported this element, as the defendant responded to the directions of two handlers who were "Chinese official[s]."  *Id.* at 824.  One of the handlers was "a senior official with the China Aviation Industry Corporation, a Chinese government ministry."  *Id.* at 819.  The other was an "engineer who worked for a naval defense contractor," *id.*, though the defendant was passed on to him by the senior official.  *Id.* at 824.  *Chung* did not attempt to construe the term foreign "official" to a meaningful extent, but it appears to have regarded both the senior ministry member and the contractor as "Chinese officials." *Id*.

Abouammo argues that Binasaker was not a foreign "official" because such a person must hold a formal public office or serve in an official position in the foreign government.  But even if we had to decide the foreign "official" question, we would not be required to delve deeply into the issue.  That is because even if one accepts Abouammo's stricter interpretation of foreign "official" in

§ 951(d), the jury had ample evidence from which to conclude that Binasaker was such an official.

Most striking is Binasaker's diplomatic visa.  In May 2015, and within the rough time period in which Binasaker was interfacing with Abouammo, Binasaker applied for an A-2 visa to accompany the King of Saudi Arabia on a visit to Camp David.  An A-2 visa is "reserved for diplomatic and official travelers" coming to perform temporary work in the United States on behalf of a foreign government.

The visa application identified Binasaker as a "foreign official/employee," listed his primary occupation as "government," and identified his employer as "Royal Court."  A State Department notation on the application likewise listed the purpose of Binasaker's visit as "Official Travel."  A reasonable jury could conclude that Binasaker was a foreign "official" under § 951(d) considering that Binasaker and his government described Binasaker on an official document in a way that, on its face, brings Binasaker within the plain language of § 951(d).  That the State Department regarded him similarly only adds to the strength of that inference.

Abouammo attempts to downplay the A-2 visa, claiming it was cursory and incomplete and that it was prepared too late in the course of Binasaker's relationship with Abouammo to have evidentiary relevance.  But to the extent conflicting inferences could be drawn from the visa and the circumstances surrounding it, the jury could have resolved those inferences in favor of the government.  *See Jackson*, 443 U.S. at 326.  In addition, the jury could have regarded the description of Binasaker on the A-2 visa as indicative of his role, given the rest of the evidence presented at trial.  That evidence included, among other things, Binasaker's use of

an email address with the official domain name of His Royal Highness Prince Mohammed's Private Office, and Abouammo's own characterization of Binasaker as a KSA official in his Seattle meeting with the FBI.

We have no occasion to conduct a full examination of the term "official" in 18 U.S.C. § 951(d) or to endorse Abouammo's narrower definition. We hold simply that even under that narrower definition, a reasonable juror could find that Binasaker was a foreign "official."

For all these reasons, sufficient evidence supported Abouammo's § 951 conviction.

## III

Abouammo next challenges his convictions for money laundering and wire fraud as barred by the statute of limitations. Reviewing de novo, *see United States v. Orrock*, 23 F.4th 1203, 1206 (9th Cir. 2022), we hold that these charges were timely.

## A

Abouammo's statute of limitations argument is rooted in the peculiarities of timing associated with his money laundering and wire fraud charges. The initial indictment, returned in November 2019, charged Abouammo with acting as an agent of a foreign government without prior notification to the Attorney General and with falsifying records in a federal investigation. It did not include charges for money laundering or wire fraud. Due to ongoing plea discussions, the parties agreed to toll the five-year statute of limitations, *see* 18 U.S.C. § 3282(a), until April 7, 2020. Then the COVID-19 pandemic hit, making the grand jury unavailable. The government tried to secure an agreement

to further extend the limitations period, but Abouammo refused.

On April 7, 2020, the day the limitations period was set to expire per the parties' agreement, the government filed a superseding information charging Abouammo with, *inter alia*, money laundering and wire fraud. Abouammo did not consent to a waiver of the indictment requirement. *See* FED. R. CRIM. P. 7(b) ("An offense punishable by imprisonment for more than one year may be prosecuted by information if the defendant—in open court and after being advised of the nature of the charge and of the defendant's rights—waives prosecution by indictment.").

On July 28, 2020, the government dismissed the information. That same day, and with COVID restrictions relaxed, the grand jury returned the superseding indictment containing the new money laundering and wire fraud charges. The charges in the superseding indictment were the same as those in the information. The question presented is whether the filing of the *information* on April 7, 2020, prior to the expiration of the statute of limitations, followed by the filing of a *superseding indictment* within six months of the dismissal of that information, made these charges timely.

B

Abouammo's argument implicates two statutory provisions, 18 U.S.C. § 3282 and 18 U.S.C. § 3288. Section 3282(a), the general statute of limitations provision, provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information *is instituted* within five years next after such offense has been committed." 18 U.S.C. § 3282(a) (emphasis added).

Abouammo argues that the term "instituted" requires that the information be sufficient to sustain a prosecution. Because a felony cannot be prosecuted by information unless the defendant waives prosecution by indictment, *see* FED. R. CRIM. P. 7(b), Abouammo concludes that an information is not "instituted" unless the defendant waives his right to be indicted by a grand jury.

The government disagrees, arguing that for statute of limitations purposes, the plain meaning of "institute" merely requires that the information be filed. The circuits that have considered the question agree with the government. *See United States v. Briscoe*, 101 F.4th 282, 292–93 (4th Cir. 2024); *United States v. Burdix-Dana*, 149 F.3d 741, 742–43 (7th Cir. 1998). We find it unnecessary to resolve the meaning of "institute" in 18 U.S.C. § 3282 because the second provision that we mentioned, 18 U.S.C. § 3288, confirms there is no statute of limitations problem.

Section 3288 provides:

> Whenever an indictment or information charging a felony is dismissed for any reason after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment or information, . . . which new indictment shall not be barred by any statute of limitations. This section does not permit the filing of a new indictment or information where the reason for the dismissal was the failure to file the indictment or information within the period prescribed by the applicable statute of

> limitations, or some other reason that would
> bar a new prosecution.

18 U.S.C. § 3288.

With one exception not applicable here, § 3288 categorically excludes from "any statute of limitations" bar a "new indictment ... returned in the appropriate jurisdiction within six calendar months" of the dismissal of an "information charging a felony." *Id.* Here, the superseding information was filed on April 7, 2020, within the statute of limitations. In that circumstance, a valid indictment under § 3288 is not subject to the five-year limitations period, because § 3282's proviso—"[e]xcept as otherwise expressly provided by law"—expressly contemplates that other provisions may govern in its stead. 18 U.S.C. § 3282(a). Section 3288 is such a provision. Consistent with the plain language of § 3288, the superseding indictment in this case was returned within six months of the dismissal of the April 7, 2020 information. The superseding indictment was therefore timely.

Abouammo nevertheless contends that the "information charging a felony" referred to in § 3288 has the same meaning he assigns to "information" in § 3282—that is, it requires an "instituted" information accompanied by a waiver of indictment. The immediate difficulty that Abouammo confronts, however, is that his position finds no support in the statutory text. Section 3288 applies "[w]henever an indictment or information charging a felony is dismissed for any reason after the period prescribed by the applicable statute of limitations has expired." 18 U.S.C. § 3288. Nothing in this language requires that the information be "instituted" or otherwise accompanied by a waiver of indictment.

But perhaps more problematically, Abouammo's position is significantly undercut by the history of this provision. As Abouammo concedes, Congress specifically removed language requiring a waiver of indictment from § 3288. The statute previously referred to "an indictment or information *filed after the defendant waives in open court prosecution by indictment.*" *See United States v. Macklin*, 535 F.2d 191, 192 n.2 (2d Cir. 1976) (providing the original text) (emphasis added). But in 1988, Congress removed the language "filed after the defendant waives in open court prosecution by indictment"—the very limitation Abouammo wishes to read back into the statute—to give us the present language of "an indictment or information charging a felony . . . ." *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Title VII, § 7081(a), 102 Stat. 4181, 4407.[4]

---

[4] To help visualize the changes, we include here the relevant text of the provision showing the stricken language, with the language added in the 1988 amendment in italics:

> ~~Whenever an indictment is dismissed for any error, defect, or irregularity with respect to the grand jury, or an indictment or information filed after the defendant waives in open court prosecution by indictment is found otherwise defective or insufficient for any cause,~~ *Whenever an indictment or information charging a felony is dismissed for any reason* after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment or information . . . which new indictment shall not be barred by any statute of limitations. *This section does not permit the filing of a new indictment or information where the reason for the dismissal was*

Abouammo responds that this 1988 amendment was merely a "technical rewriting" of the statute that was not meant to have substantive effect.  But "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *United States v. Pepe*, 895 F.3d 679, 686 (9th Cir. 2018) (quoting *Pierce Cty. v. Guillen*, 537 U.S. 129, 145 (2003)).  It is difficult to describe the amendments here as merely technical.    And when Abouammo's argument already lacks a textual foundation in § 3288, we are reluctant to interpret that provision to include a requirement that Congress specifically removed.    We therefore hold that when the government secured a superseding indictment within six months of the dismissal of the April 7, 2020 information, which was filed within the limitations period, the government complied with 18 U.S.C. § 3288, so that the superseding indictment was timely.

Our conclusion finds support in the Seventh Circuit's decision in *United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998).  In that case, with the statute of limitations set to expire on or about February 24, 1997, the government filed an information on February 20, 1997, and the grand jury then returned an indictment on March 4, 1997.  *Id.* at 742.  The Seventh Circuit first held that the information was properly "instituted" under § 3282, because although the government cannot proceed with a felony prosecution until it secures either an indictment or waiver of indictment, "[w]e do not see how this rule affects the statute governing the limitation period."  *Id.* at 742–43.    The court then held that the

---

*the failure to file the indictment or information within the period prescribed by the applicable statute of limitations, or some other reason that would bar a new prosecution.*

government had validly proceeded with its prosecution because the indictment was timely under § 3288, which "allows the government to file an indictment after the limitations period has run." *Id.* at 743; *see also United States v. Rothenberg*, 554 F. Supp. 3d 1039, 1045 (N.D. Cal. 2021) (explaining how the statutory changes to § 3288 support finding a superseding indictment timely).

Abouammo suggests that under our reading of § 3288, the government could file a placeholder information and then control the limitations period by securing an indictment within six months of dismissing the information. But as the district court recognized, other safeguards will continue to protect criminal defendants from that kind of over-extension. That is because (1) an information must still be sufficiently specific, FED. R. CRIM. P. 7(c); (2) it presumptively entitles the defendant to a prompt preliminary hearing, FED. R. CRIM. P. 5.1; and (3) the defendant can move to dismiss the information, FED. R. CRIM P. 12(b)(3)(A)–(B). As the Seventh Circuit pointed out, the situation of a prosecutor filing an information and then waiting indefinitely to obtain an indictment "would only arise if the defendant charged in the information rests on her rights and does not move for dismissal of the information herself." *Burdix-Dana*, 149 F.3d at 743. And the government acknowledges that at some point, substantial delay in obtaining an indictment under § 3288 could present speedy trial or due process concerns.

No such concerns are present in this case, as there is no evidence of government abuse or bad faith. The government could not return to the grand jury in April 2020 because grand jury proceedings were suspended as a result of the COVID-19 pandemic. When those restrictions were lifted, the government promptly secured a superseding indictment. Any concern with the government "sitting" on an

information is simply not presented on these facts.  We thus hold that Abouammo's money laundering and wire fraud counts were timely charged.

IV

Abouammo next argues that his conviction for falsification of records with intent to obstruct a federal investigation, 18 U.S.C. § 1519, should be dismissed due to improper venue.  Reviewing de novo, *United States v. Lozoya*, 982 F.3d 648, 650 (9th Cir. 2020) (en banc), we hold that venue on Abouammo's § 1519 charge was proper in the Northern District of California, where the allegedly obstructed federal investigation was taking place.  We therefore affirm Abouammo's conviction under 18 U.S.C. § 1519.

A

Section 1519 provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.  To convict Abouammo under this provision, the government was required to show that

Abouammo "(1) knowingly committed one of the enumerated acts in the statute, such as destroying or concealing; (2) towards any record, document, or tangible object; (3) with the intent to obstruct an actual or contemplated investigation by the United States of a matter within its jurisdiction." *United States v. Singh*, 979 F.3d 697, 715 (9th Cir. 2020) (quoting *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015)).

Abouammo's § 1519 charge was based on the fake invoice for social media consulting services that he created during his October 2018 interview with the FBI at his home in Seattle. As we described above, the federal investigators who came to Abouammo's residence identified themselves as "FBI agents from the San Francisco office." When they asked Abouammo if he had documentation supporting his consulting work for Binasaker, Abouammo went upstairs and created a falsified invoice that he then emailed to the agents who were in his home. The district court concluded that venue on the § 1519 charge was proper in the Northern District of California because "the crime is tied to the potentially adverse effect upon a specific (pending or contemplated) proceeding, transaction, etc., and venue may properly be based on the location of that effect."

The question before us is whether venue for a charge under 18 U.S.C. § 1519 is limited to the district in which the false document was prepared, or whether venue can also lie in the district in which the obstructed federal investigation was taking place. It appears that no circuit has yet to address this question in the context of § 1519.

B

The Constitution mandates that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes

have been committed."  Art. III, § 2, cl. 3; *see also Smith v. United States*, 599 U.S. 236, 242–43 (2023).  Echoing this requirement, the Federal Rules of Criminal Procedure provide that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." FED. R. CRIM. P. 18.  But venue for a criminal prosecution may be available in more than one district.    Under 18 U.S.C. § 3237(a), "[e]xcept as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Section 1519 lacks an express venue provision.  In that situation, venue "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Fortenberry*, 89 F.4th 702, 705 (9th Cir. 2023) (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)).  That is, "we 'must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts.'" *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)).  "To determine the 'nature of the crime,' we look to the 'essential conduct elements' of the offense." *Id.* (quoting *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002)).  The "essential conduct elements" of an offense are to be distinguished from its "circumstance elements." *Fortenberry*, 89 F.4th at 705 (quoting *Rodriguez-Moreno*, 526 U.S. at 280 n.4).  The latter are elements that are "necessary for a conviction but not a factor in deciding the location of the offense for venue purposes."  *Id.* at 706.

Abouammo does not dispute that for some criminal offenses, the place where the effects of the crime are directed or sustained can be an appropriate venue for prosecution, even if the acts that would produce those effects took place in a different district.  As we have recognized, "there certainly are crimes that may be prosecuted where their effects are felt."  *Fortenberry*, 89 F.4th at 711.  Instead, Abouammo's contention is that 18 U.S.C. § 1519 is not drafted in a way that treats the obstructed federal investigation as an essential element of the offense for purposes of venue.  Two of our precedents provide the core framework for analyzing whether § 1519 should be read as allowing "effects-based" venue.

The first is *United States v. Angotti*, 105 F.3d 539 (9th Cir. 1997).  The defendant, Angotti, submitted false loan documents to a mortgage company ("an innocent middle agent"), which sent the materials to a bank branch in the Northern District of California, which then forwarded the materials for approval to the bank's headquarters in the Central District of California.  *Id.* at 541.  Angotti was charged in the Central District with violating 18 U.S.C. § 1014, which criminalizes "'knowingly making any false statement . . . for the purpose of influencing . . . the action' of a federally insured institution."  *Id.* at 542 (quoting 18 U.S.C. § 1014).

We held that venue was proper in the Central District. *Id.*  We acknowledged that "some of the criminal conduct occurred in the Northern District, where the statements were submitted."  *Id.*  But because "Angotti was charged with making false statements for the purpose of influencing the actions of bank officials" located in the Central District, venue was proper in that district, "where the communication

reached the audience whom it was intended to influence." *Id.*

We recognized in *Angotti* that the statute of conviction, 18 U.S.C. § 1014, criminalized conduct that did not depend on any actual effects occurring in the Central District. "There is no question," we explained, "that a crime was committed once Angotti's statements reached the bank office in the Northern District," and that "the statements did not have to reach their intended destination in order to constitute a crime." *Id.* at 543. For purposes of criminal liability, it was sufficient that "Angotti's statement was made for the purpose of influencing the bank official who had the power to approve his loan." *Id.*

But venue in the Central District was appropriate because under 18 U.S.C. § 3237, "the crime of making a false statement is a continuing offense that may be prosecuted in the district where the false statement is ultimately received for final decisionmaking." *Angotti*, 105 F.3d at 542. We reasoned that "the act of making a communication continues until the communication is received by the person or persons whom it is intended to affect or influence." *Id.* at 543. Therefore, on the facts before us, Angotti's "act of 'making' the false statements continued until the statements were received by the person whom they were ultimately intended to influence." *Id.*; *see also id.* (noting that "the documents did reach the Central District").

The second key precedent is *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023). That case concerned the conviction of former Nebraska congressman Jeffrey Fortenberry for making false statements to FBI agents investigating illegal campaign contributions by a

foreign national. *Id.* at 704–05. Fortenberry made these false statements during interviews in Nebraska and Washington, D.C. to agents from the FBI's Los Angeles office, from which the government was running its investigation. *Id.* at 704.

Fortenberry was charged in the Central District of California with violating 18 U.S.C. § 1001. *Id.* at 704–05. That statute imposes criminal liability on anyone who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; [or] (2) makes any materially false, fictitious, or fraudulent statement or representation . . . ." 18 U.S.C. § 1001. Upon his conviction, Fortenberry argued on appeal that venue in the Central District was improper. *Id.* at 705.

We agreed with Fortenberry. We held "that an effects-based test for venue of a Section 1001 offense has no support in the Constitution, the text of the statute, or historical practice." *Fortenberry*, 89 F.4th at 704. Instead, "[b]ecause a Section 1001 offense is complete at the time the false statement is uttered, and because no actual effect on federal authorities is necessary to sustain a conviction, the location of the crime must be understood to be the place where the defendant makes the statement." *Id.* at 712. We reached this conclusion after identifying "the essential conduct of a Section 1001 offense to be the making of a false statement." *Id.* at 706.

The government in *Fortenberry* pointed to the statute's requirement that the false statement be material. On this basis, it urged us to permit effects-based venue on the theory that materiality "depends on how a listener would perceive

the utterance, wherever the listener might be located." *Id.* at 706. We rejected this argument. We explained that "[m]ateriality is not conduct because it does not require anything to actually happen." *Id.* at 707. Because the only essential conduct was making the false statement, the "offense is complete when the statement is made." *Id.* It was significant, in our view, that a conviction under § 1001 did "not depend on subsequent events or circumstances, or whether the recipient of the false statement was in fact affected by it in any way." *Id.*

In reaching our result in *Fortenberry*, we found our prior decision in *Angotti* "readily distinguishable." *Id.* at 710. As we discussed above, the statute in *Angotti*, 18 U.S.C. § 1014, criminalized a false statement made "for the purpose of influencing . . . the action" of a federally insured institution. *Angotti*, 105 F.3d at 542. *Fortenberry* explained that this statute differed from § 1001 because § 1014 "expressly contemplates the effect of influencing the action of a financial institution." *Fortenberry*, 89 F.4th at 710. The statute of conviction in *Fortenberry*, by contrast, contemplated no similar effect as part of its essential conduct. Instead, under § 1001, "[t]o determine whether a statement is misleading in a *material* way, we probe the '*intrinsic* capabilities of the statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances.'" *Id.* (quoting *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998)).

C

We now return to Abouammo's statute of conviction, 18 U.S.C. § 1519. That provision is analogous to the statute of conviction in *Angotti*, and it differs from the statute of conviction in *Fortenberry*. *Angotti* governs. Precedent thus

leads us to conclude that venue over Abouammo's § 1519 charge was proper in the Northern District of California.

Abouammo's statute of conviction required him to have falsified a record "*with the intent to impede, obstruct, or influence the investigation* or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case."  18 U.S.C. § 1519 (emphasis added).    This language is analogous to the language in 18 U.S.C. § 1014, the statute of conviction in *Angotti*, which punishes "'knowingly mak[ing] any false statement . . . *for the purpose of influencing . . . the action*' of a federally insured institution."  105 F.3d at 542 (quoting 18 U.S.C. § 1014) (emphasis added).

Like the provision at issue in *Angotti*, § 1519 "*expressly contemplates* the effect of influencing the action" of another. *Fortenberry*, 89 F.4th at 710 (emphasis added).  In *Angotti*, the entity acted upon was a federally insured financial institution.    Here, it is "an actual or contemplated investigation by the United States of a matter within its jurisdiction."  *Singh*, 979 F.3d at 715 (quoting *Katakis*, 800 F.3d at 1023).    But the wording and structure of the provisions are effectively the same.    And the express connection between the actus reus and its contemplated effect on another (financial institution or federal investigation) is patent.

In both instances, therefore, it is proper to conclude that the contemplated effects are part of the "essential conduct" of the offense for venue purposes because the statutes expressly define the conduct in those terms.    *See Fortenberry*, 89 F.4th at 706.  *Fortenberry* thus supports the contention that, where the statute's language expressly

contemplates a defendant falsifying a document with intent to impede an investigation, venue can be proper in either the district where the wrongful conduct was initiated—where the false record was created—or the district of the expressly contemplated effect—where the investigation it was intended to stymie is ongoing or contemplated. *See Singh*, 979 F.3d at 715.

The statute in *Fortenberry* was different. In criminalizing materially false statements, *Fortenberry*, 89 F.4th at 705 (citing 18 U.S.C. § 1001(a)), the statutory language did not "expressly contemplate[] the effect of influencing the action" of another, and so did not on that basis permit an effects-based test for venue purposes. *Id.* at 710; *see also id.* ("No such language is used in Section 1001."). *Fortenberry* aligned itself with our prior decision in *United States v. Marsh*, 144 F.3d 1229 (9th Cir. 1998), which involved statutory language similar to that in *Fortenberry*. *See Fortenberry*, 89 F.4th at 710–11 (describing *Marsh* as "involving [a] conceptually similar statute[]").[5]

Our precedents thus divide into two camps. The first involves statutes that "expressly contemplate[] the effect of influencing the action." *Id.* at 710. These provisions use specific statutory language that explicitly connects the wrongful statement to the thing to be affected—using

---

[5] *Marsh* concerned 26 U.S.C. § 7212, which provides: "Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall" be punished. *See Marsh*, 144 F.3d at 1234, 1242.

language such as "for the purpose of influencing" an entity. This was *Angotti*.  *See Fortenberry*, 89 F.4th at 710–11 (distinguishing *Angotti*).  These types of statutes, through language like "for the purpose of," expressly contemplate effects-based venue.  The second camp involves statutes that lack this kind of express statutory language, as in *Fortenberry* and *Marsh*.  *See id.* at 710–11.

As we have explained, the statute here contains express language analogous to that in *Angotti*.  *Angotti*—and *Fortenberry*'s interpretation of *Angotti*—thus require the conclusion that 18 U.S.C. § 1519 be read as permitting venue in the location where the effects of the criminal wrongdoing can be felt.  Any other conclusion would ignore our binding precedent in *Angotti*.

Having considered "the conduct constituting the offense"—and having concluded that § 1519 permits effects-based venue in the location where the obstructed investigation was taking place—we next "discern the location of the commission of the criminal acts." *Lukashov*, 694 F.3d at 1120 (quoting *Rodriguez-Moreno*, 526 U.S. at 279).  In *Angotti*, we concluded that § 1014 was a continuing offense, *see* 18 U.S.C. § 3237(a), and that the offense of making a false loan document continued "until the statements were received by the person whom they were ultimately intended to influence," who was located in the Central District of California.  *Angotti*, 105 F.3d at 543.

That same analysis applies here.  Abouammo's act of making a false document "with the intent to impede, obstruct, or influence" a federal investigation, 18 U.S.C. § 1519, continued until the document was "received by the person or persons whom it [was] intended to affect or influence."  *Angotti*, 105 F.3d at 543.  And here it was

received by FBI agents working out of the FBI's San Francisco office.  In these circumstances, the offense was continued or completed in the Northern District, making venue proper there.  18 U.S.C. § 3237(a); *see also Lukashov*, 694 F.3d at 1211 (explaining that "a continuing offense 'does not terminate merely because all the elements are met,'" but is instead "committed 'over the whole area through which force propelled by an offender operates'") (first quoting *United States v. Lopez*, 484 F.3d 1186, 1192 (9th Cir. 2007) (en banc); then quoting *United States v. Johnson*, 323 U.S. 273, 275 (1944)).  We need not decide whether venue would have been proper in the Northern District of California had Abouammo not transmitted the falsified documents to the agents.  At minimum, the fact that he did confirms that venue was proper there.  *See* 18 U.S.C. § 3237(a).

Abouammo nevertheless argues that under *Fortenberry*, for venue to lie in the district where ill effects are to be felt, the statute must itself require that the wrongful conduct "actually affect" something in that district.  And because § 1519 does not require that the falsification of records necessarily affect an ongoing investigation (or even that the investigation be ongoing, as opposed to merely contemplated), Abouammo maintains that under *Fortenberry*, venue can lie only in the district in which he created the false invoice.

Abouammo misunderstands *Fortenberry* and, in the process, would have us contradict *Angotti*.  As we have discussed, the threshold problem in *Fortenberry* was that the statute of conviction did not "expressly contemplate[] the effect of influencing the action" of another, as it did in *Angotti*.  *Fortenberry*, 89 F.4th at 710.  In the absence of such express statutory language, *Fortenberry* considered

whether the statute permitted effects-based venue on the theory that the statute necessarily required the proscribed actus reus to have real-world effects. *Id.* at 706 (explaining the government's position that materiality under § 1001 "necessarily depends on how a listener would perceive the utterance, wherever the listener might be located").

*Fortenberry* held that this theory failed because "[m]ateriality" "does not require anything to actually happen." *Id.* at 707. Because "materiality requires only that a statement have the capacity to influence a federal agency," § 1001's materiality requirement was not sufficient on its own to reflect an effects-based test for venue. *Id.* It was in this context that we observed that § 1001 "proscribes making materially false statements—not actually affecting or interfering with a federal agency's investigation through the making of the statements." *Id.* at 709.

Contrary to Abouammo's argument on appeal, this aspect of our discussion in *Fortenberry* does not mean that for effects-based venue to lie, the statute of conviction must always require an "actual" obstructive effect on someone or something within the district. That would not be consistent with our decision in *Angotti*. In *Angotti*, the statute of conviction did not require the false statement to actually affect or interfere with a federally insured institution—just that the statement be made "for the purpose of influencing . . . the action" of such an institution. 105 F.3d at 542 (quoting 18 U.S.C. § 1014). Indeed, in *Angotti* we were clear that under § 1014, "there is no question that a crime was committed once Angotti's statements reached the bank office in the Northern District," meaning that "the statements *did not* have to reach their intended destination in order to constitute a crime." *Id.* at 543 (emphasis added). Notwithstanding this, we held that venue could lie in a

district other than where the false statements were first made. *Id.* at 543–44.

Properly considered, then, under *Fortenberry* the statute of conviction need not categorically require "actual" adverse effects or interference in a district for effects-based venue to be proper there. Rather, we considered whether such actual effects were a necessary feature of the statute of conviction in *Fortenberry* only because the statutory language did not "expressly contemplate[] the effect of influencing the action of" another. *Fortenberry*, 89 F.4th at 710. When the statute *does* expressly contemplate those effects—through language such as "for the purpose of" or "with the intent to"—there is no additional venue requirement that the statute proscribe conduct that, by definition, actually affects or interferes with something in the venue. Instead, when the statute "expressly contemplates the effect of influencing" another, *id.* at 710, venue can be secured by demonstrating that, on the facts, the offense continued or was completed in that district. *See Angotti*, 105 F.3d at 543–44; 18 U.S.C. § 3237(a). That is the case here.

## D

Abouammo expresses concern that our interpretation of § 1519 will unduly prejudice criminal defendants. But his concerns are both overstated and ones that our past precedents have already found insufficient.

We previously recognized in *Angotti* that "venue will often be possible in districts with which the defendant had no personal connection, and which may occasionally be distant from where the defendant originated the actions constituting the offense." 105 F.3d at 543. But this is a feature, not a bug, of a system of rules that allows for effects-based venue and treats some offenses as continuing in

nature, thereby expanding the locations in which a crime is deemed committed. *See United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012) ("Yet, while the venue requirement protects the accused from the unfairness and hardship of prosecution in a remote place, the constitutional text makes plain that unfairness is generally not a concern when a defendant is tried in a district wherein the crime shall have been committed.") (quotations, citations, and alterations omitted). Nor are criminal defendants necessarily stuck in distant fora. As we explained in *Angotti*, a defendant is free to ask that the proceedings, or one or more counts, be transferred to a more convenient district. *See Angotti*, 105 F.3d at 544 (citing FED. R. CRIM. P. 21(b)).

Finally, we note that even if concerns of perceived unfairness could overcome both statutory text and precedent, there is nothing particularly unfair about Abouammo's prosecution for falsification of records taking place in the Northern District of California. The FBI agents who interviewed Abouammo identified themselves as "FBI agents from the San Francisco office." Although it was not necessary for the government to show that Abouammo specifically foresaw effects in the Northern District, *see Gonzalez*, 683 F.3d at 1226 (first citing 18 U.S.C. § 3237(a), then citing *Angotti*, 105 F.3d at 545), Abouammo can hardly feign surprise at the existence of a federal investigation being conducted in the Northern District of California. There are also many other features of this case that connect Abouammo to the Northern District, most obviously his employment with Twitter, which gave rise to the entire case.

In *Fortenberry*, by contrast, "[t]he only connection between Fortenberry and the Central District of California, where he was tried and convicted, was that the agents worked in a Los Angeles office." 89 F.4th at 709. The

location of the agents is hardly the only connection to the venue in this case.

Indeed, the connection to the venue here is arguably stronger than in *Angotti*. There, the falsified loan document reached the Central District only because "an innocent middle agent" mortgage company "unwittingly" sent the loan documents to a bank branch in the Northern District of California, which then sent them to the bank's headquarters in the Central District. *Angotti*, 105 F.3d at 541. Here, Abouammo himself directly transmitted a false document to FBI agents from San Francisco. This is not a situation in which the government can be described as manipulating or manufacturing venue.

We hold that a prosecution under § 1519 may take place in the venue where documents were wrongfully falsified or in the venue in which the obstructed federal investigation was taking place. Abouammo's misconduct properly subjected him to prosecution in either venue. We affirm Abouammo's conviction under § 1519.

\*       \*       \*

We affirm Abouammo's convictions. But as set forth in our accompanying memorandum disposition, we vacate his sentence and remand for resentencing.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

LEE, Circuit Judge, concurring:

Our Constitution requires criminal trials to be "held in the State where the said Crimes shall have been convicted." Art. III, § 2, cl. 3. While this venue provision may appear somewhat technical, the Framers included it because they feared governmental abuse of power. They experienced it firsthand, as the English government had routinely transported colonial defendants to England to be tried there. *See* DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (listing "transporting us beyond Seas to be tried for pretended offences" as one of the "repeated injuries and usurpations" by King George).

Relying on this constitutional guarantee, Ahmad Abouammo—who falsified records at his home in Seattle—challenges his conviction in part for having been tried in the Northern District of California. I agree with Judge Bress' excellent opinion, including his analysis of why Abouammo's venue argument fails under our circuit's precedent. I write separately to highlight that our decision today does not give free rein to the government to manufacture venue and that we should scrutinize potential fig-leaf justifications for venue in future cases.

\* \* \* \*

Abouammo, a former Twitter employee, accessed company databases about the platform's users and provided personal information about a Saudi dissident user to a Saudi national. That Saudi national later wired $100,000 to a bank account opened by Abouammo and gave him an expensive Hublot watch.

When FBI agents from the San Francisco office interviewed Abouammo at his Seattle home, he claimed that

he had done consulting work for the Saudi national and fabricated a fake invoice. Later, a jury in the Northern District of California convicted Abouammo for falsifying records with the intent to impede a federal investigation in violation of 18 U.S.C. § 1519.

Abouammo argues that he should have been tried in Seattle, not in Northern California, because he created the fake invoice at his home there. As Judge Bress explains in his opinion, Abouammo's venue argument falters under our precedents. We have held that venue in a criminal trial may be proper in either the place where the criminal act occurred or where the effects of the crime were directed for a continuing offense. *See United States v. Angotti*, 105 F.3d 539 (9th Cir. 1997) (venue proper in the Central District of California for the charge of making false statement to influence the action of a federally insured institution because the false loan documents sent to the bank branch in the Northern District were ultimately approved by the bank's headquarters in the Central District).

Here, Abouammo falsified his invoice with the intent to obstruct a federal investigation being conducted by FBI agents based in San Francisco. Under *Angotti*'s reasoning, the Northern District of California was a proper venue: the crime of falsifying records is a "continuing offense that may be prosecuted in the district where the false [record] is ultimately received" by the people it was intended to influence. *Angotti*, 105 F.3d at 542. It is no surprise that FBI agents from San Francisco investigated Abouammo because Twitter was headquartered there. In short, there is no whiff that the government intentionally used San Francisco-based FBI agents to manufacture venue in the Northern District of California.

But one can imagine some government officials trying to game the system by involving agents from a particular district with an eye towards asserting venue in what they view as a favorable district.  For example, an investigation based in North Carolina might enlist the help of FBI agents from Washington, D.C. purportedly based on expertise or a lack of resources.  And if someone provides a false document to a D.C.-based agent, then the government could perhaps argue that the case should be tried in Washington, D.C. because that person had the "intent to impede, obstruct, or influence the investigation" being conducted by agents based in D.C.  18 U.S.C. § 1519.

We should be wary of such attempts by the government to cherry-pick favored venues through pretextual reliance on out-of-district agents.  The Constitution safeguards against such abuse of power by ensuring that criminal defendants face a jury of their peers in the appropriate venue.  *See United States v. Johnson*, 323 U.S. 273, 275 (1944) ("Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers wrote [this] into the Constitution."); *see also* U.S. CONST. amend. VI.  Courts should thus smoke out any governmental schemes to manufacture venue and transfer such cases to the appropriate forum.  *See* FED. R. OF CRIM. PROC. 21(b).